## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

United States of America,

                         Plaintiff,        Case No. 20-cr-20322

v.                                    Judith E. Levy
                                    United States District Judge

Markeithis Jawuan Smith,

                         Defendant.    Mag. Judge Elizabeth A. Stafford

_____/

## OPINION AND ORDER GRANTING
## <u>DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [19]</u>

On April 29, 2021, Defendant Markeithis Jawuan Smith filed a motion to suppress evidence. (ECF No. 19.) The government responded (ECF No. 25), and Defendant replied. (ECF No. 28.) On June 24, 2021, the Court held an evidentiary hearing. The government called as witnesses two police officers from the Jackson County Sheriff's Office: (1) Deputy Archie Wickham, and (2) Sergeant Cullen Knoblauch. The Court heard oral argument as well.

In his motion, Defendant asks that the Court suppress evidence that was seized during a stop "and any additional evidence that is the

fruit of that illegal seizure" because Wickham, the officer who stopped him, lacked "reasonable, particularized suspicion," so the stop violated the Fourth Amendment. (ECF No. 19, PageID.41, 43, 45.) Defendant argues that the stop was improper because it was based solely on a description Wickham received from dispatch. (*See id.* at PageID.42–43.) Defendant states that the description was "vague" and "overbroad" and was provided by "an anonymous caller whose reliability could not be tested." (*Id.* at PageID.54.) The government disputes that the description came from a tip that was anonymous and argues that Wickham had reasonable suspicion to stop and search Defendant based on the totality of the circumstances. For the reasons set forth below, Defendant's motion is GRANTED.

## I.   Background

Defendant is charged with one count of illegal receipt of a firearm by a person under indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D). (ECF No. 1.) This charge is "based on the recovery of a firearm after a stop by Deputy Wickham [at Greenwood Food Market[1]

---

[1] In this Opinion and Order, Greenwood Food Market is also referred to as "Greenwood Food and Beverage."

located] at 212 W. Biddle Street in Jackson, Michigan." (ECF No. 19, PageID.41.)

## A. The Stop at Greenwood Food Market

Wickham stopped Defendant at Greenwood Food Market at around 11:00 p.m. on February 22, 2020 after "20-30 gunshots were fired near 332 W. Morrell Street in Jackson, Michigan." (*Id.* at PageID.42.) That night, Wickham "responded to assist the Jackson City Police Department with a shots fired call in the area of Greenwood and W. Biddle St." (ECF No. 19-3, PageID.86.) According to a report authored by Wickham, "[p]rior to arriving in the area dispatch advised several shots had been fired and they gave a description of several black males running from the area wearing all black with black hooded sweatshirts and the hoods pulled over their heads."[2] (*Id.*; *see* ECF No. 19-4, PageID.88.)

Wickham—who has worked for the Jackson County Sheriff's Office for seventeen years and has spent the last six years on road patrol—and

---

[2] Wickham testified that on his radio he scans the dispatch information for both the Jackson County Sheriff's Office and the Jackson City Police Department, the two of which share a dispatch center. On February 22, 2020, he was listening to the County's and the City's dispatch information as he made his way to the area where the shots were reportedly fired. He also listened to it when he was no longer in his car by using a portable radio.

3

Knoblauch—who recently retired after over twenty-two years in law enforcement, primarily serving as a road patrol officer—testified that the shots were fired in a high crime area. Wickham estimated that shots are fired in the area "at least once a week, if not more," and Knoblauch stated that "it's a very hot or very popular area for shots fired calls." Knoblauch stated that the area has a large African American population. In terms of the area that they were describing, the government indicated at the hearing that Wickham's testimony related to "the area generally associated with" the maps the parties included as exhibits to their filings. (*See* ECF No. 25-4, PageID.126; ECF No. 28-2, PageID.139.) And Knoblauch defined the high crime area as the area south of West Wesley Street, north of the City's southern limit, east of West Avenue, and west of Cooper Street. He stated that it is a "fairly large" area.

When Wickham heard dispatch report that shots had been fired, he was in a car in the parking lot of the Jackson County Sheriff's Office at 212 West Wesley Street. Wickham left the parking lot and drove west on West Wesley Street because he heard that the shots fired were coming from the area of the 300 block of Morrell Street. He then went south on South Blackstone Street, also in the direction of the shots fired. When he

4

was on South Blackstone Street, Wickham heard that the suspects were running east toward Greenwood Cemetery,[3] so he turned left on West Biddle Street (before reaching Morrell Street) and traveled east toward Greenwood Food Market, which he indicated is on the northeast corner of West Biddle Street and Greenwood Avenue.[4] Wickham testified that the market's parking lot is accessible from both West Biddle Street and Greenwood Avenue. He indicated on cross-examination that dispatch never said that the suspects headed north to Greenwood Food Market.

Wickham wrote in a report that

---

[3] Wickham testified that Greenwood Cemetery is at the southeast corner of Morrell Street and Greenwood Avenue and is east of where the shots were fired on West Morrell Street. The maps Defendant provided as exhibits to his reply brief identify the cemetery that is southeast of where Morrell Street and Greenwood Avenue intersect as "Mt Evergreen Cemetery." (ECF No. 28-2, PageID.139–140.)

Wickham understood that the suspects were running east toward the cemetery based on dispatch's communication from "10:59:21 P.M." that said: "Black hoodies all running to Greenwood Cemetery from Union and Greenwood." This communication caused Wickham to alter his course of travel. To the extent that "Union" is a reference to Union Street, Wickham stated during cross-examination that he did not know that Union Street is one street south of Morrell Street.

[4] On cross-examination, Wickham could not recall the speed he was traveling in his car, but he agreed that he was traveling faster than the average person could walk.

> [a]s I came down W. Biddle St[reet] approaching Greenwood [Avenue][5] I observed 2 black males wearing all black and black hoodies in the parking lot of Greenwood Food & Beverage party store. I informed dispatch I would be out with those subjects. As I approached the lot both males entered the store.

(ECF No. 19-3, PageID.86; *see* ECF No. 19-4, PageID.88.) The Dispatch Report contains an entry from "11:01:04 PM" that says: "PER 512-2 B/MS BLK HOODIES JUST RAN INTO GW FOOD." (ECF No. 25-2, PageID.116, 120.) Wickham testified that "512-2" refers to him; it is his call sign because that is his car's number.

Wickham first saw the two individuals mentioned in his report when he was at the stop sign at West Biddle Street and Greenwood Avenue, across the street from Greenwood Food Market. Wickham believed that the individuals matched the description from dispatch because they were Black males wearing all black and black hoodies, and he recalled that their hoods were up. It was dark outside except for streetlights, but Wickham's view of the individuals was clear and

---

[5] The Court believes that Wickham's references to "Greenwood Street" are meant to be references to "Greenwood Avenue" because in the maps provided by the parties as exhibits to their filings, Greenwood Avenue intersects with Morrell Street north of the cemetery and south of Greenwood Food Market. (*See* ECF No. 25-4, PageID.126; ECF No. 28-2, PageID.139–140.)

unobstructed. Wickham stated that the individuals were walking westbound on West Biddle Street in front of the market and in the market's parking lot, so they were walking toward Wickham (who was facing east on West Biddle Street), toward Greenwood Avenue, and toward the location of the shooting. The individuals looked in Wickham's direction and saw Wickham, continued walking, and walked into the market. Wickham agreed during his testimony that the individuals would have been coming from South Jackson Street. Wickham indicated during cross-examination that when he saw the individuals, he was not aware that they were engaged in any kind of criminal activity.

Wickham acknowledged during his testimony that the information he heard from dispatch was that six Black males dressed all in black and wearing black hoodies were running from the 300 block of West Morrell Street toward the cemetery. But he indicated that, based on his experience as a police officer, he would not consider it strange to find the individuals spread out in different locations. He stated that individuals who commit a crime typically run away from the crime.

Wickham pulled into Greenwood Food Market's parking lot and waited for backup. Because the call involved guns, he did not want to go

inside the market by himself for safety reasons. Wickham's report indicates that Knoblauch, who was Wickham's supervisor that night, arrived at the parking lot,[6] and Wickham informed him of the situation. (*See* ECF No. 19-3, PageID.86.) Knoblauch had heard "[d]ispatch advise[] they received calls that the suspects in the shots fired call were black males wearing all black." (ECF No. 19-4, PageID.88.)

When one of the individuals who Wickham had observed enter Greenwood Food Market exited the store, Knoblauch stopped him and patted him down, "and no weapons were located."[7] (*Id.*; *see* ECF No. 19-2, PageID.81; ECF No. 19-3, PageID.86.) Wickham testified that the individual was not out of breath. Knoblauch recorded his interaction with this individual in a written report as follows:

> When the first suspect walked out of the Greenwood Food and Beverage he stated his name was Deante Smith. He said his friend Markeithis Smith was inside Greenwood Food and Beverage. I asked him if he had heard shots fired he stated he heard approximately 20 shots fired and pointed in a south direction. He then stated that he came from the south

---

[6]  Knoblauch estimated that he arrived at Greenwood Food Market approximately five minutes after hearing the shots fired himself.

[7] Knoblauch agreed during the hearing that he detained and searched the individual who walked out of Greenwood Food Market. Knoblauch also agreed that the individual complied with his orders.

direction in the area of, the subject started to say he had come from Morrell Street then stated that he was on Williams Street when he heard the shots fired. At that point, Deputy Wickham did walk into the Greenwood Food and Beverage while I was there with [Jackson City Police] Officer Stallworth. The subject then stated that he was at the Franklin Homes which are on Franklin Street and Francis.[8] Before I walked into Greenwood Food and Beverage the subject stated that he came down Biddle Street. At that point, the subject was left with Officer Stallworth.

(ECF No. 19-4, PageID.88; *see* ECF No. 19-5, 01:01–02:31.) With respect to the individual's statement about being on Morrell Street, Knoblauch's body camera footage reflects that the individual stated that he heard the shots fired and said: "I was on Morrell, though. I was on Morr—Williams Street." (ECF No. 19-5, 01:43–02:15.)

Wickham's report does not mention what the individual said to Knoblauch.[9] (*See* ECF No. 19-3, PageID.86.) Wickham testified that he heard Knoblauch speak with the individual and heard the individual

---

[8] Wickham testified that the Franklin Homes are located at the corner of Franklin Street and Warwick Court.

[9] Wickham's report provides the following information about the individual who exited Greenwood Food Market: "[O]ne of the black males exited the store. We did make contact with the subject and he was patted down. Nothing was found on this person. I then entered the store to talk with the second subject." (ECF No. 19-3, PageID.86.)

mention Morrell Street, Williams Street, and the Franklin Homes. Wickham stated that the individual said he was on Morrell Street while gesturing toward the west (in the direction of where the shots were fired), then "corrected himself and said Williams," and then mentioned the Franklin Homes, which are farther east than Williams Street. Wickham believed that the individual was "giving inconsistent statements as to what he heard and what he saw." However, Wickham's and Knoblauch's body camera footage show that after the individual mentioned Williams Street, and before he mentioned the Franklin Homes, Wickham walked away from the individual and entered Greenwood Food Market. (*See* ECF No. 19-5, 02:00–02:15; ECF No. 19-6, 01:20–01:40; *see also* ECF No. 19-4, PageID.88.) And at the hearing, Wickham indicated that Morrell Street intersects with East Williams Street. He testified that Williams Street, which runs from north to south, is east of Greenwood Food Market and one street east of South Jackson Street.

Wickham testified that the individual saying he was on Morrell Street was relevant because the shots were fired on Morrell Street. Wickham also testified that the name the individual provided of the other

10

individual who was still inside the market—Markeithis—did not mean anything to Wickham and that Wickham did not know that person.

Wickham entered Greenwood Food Market to speak with the second individual, who is the Defendant in this case. (*See* ECF No. 19-3, PageID.86; ECF No. 19-4, PageID.88; ECF No. 19-6, 01:30–01:43.) Wickham indicated that he entered the store while the other officers were still speaking with the first individual because he did not know if Defendant had a weapon, was trying to get rid of a weapon, or was trying to escape. Wickham encountered Defendant near the cash register (*see* ECF No. 19-3, PageID.86; ECF No. 19-6, 01:40–01:45) and testified that Defendant did not appear to be sweating or out of breath from running. Wickham ordered Defendant to put his hands on his head "[d]ue to the nature of the call," and Defendant complied. (ECF No. 19-3, PageID.86; *see* ECF No. 19-6, 01:44–01:47.) Wickham first made physical contact with Defendant when he grabbed Defendant's right wrist and brought it up to place Defendant's hand on Defendant's head. (*See* ECF No. 19-6, 01:44–01:47.) As this was happening, Defendant raised his left hand to his head as well. (*See id.*) Wickham proceeded to search Defendant, conducting what Wickham referred to as a "Terry pat." Before making

11

physical contact with Defendant, Wickham had not been threatened by Defendant, did not see a firearm on Defendant, did not know that Defendant was armed, and knew nothing about Defendant. Wickham agreed during cross-examination that all of the information he obtained about Defendant came from patting down or searching him.

Wickham's body camera footage captures Wickham saying the following to Defendant from the moment Wickham walked into the store and saw Defendant to the moment Wickham ordered Defendant to put his hands behind his back prior to handcuffing him:

> Wickham: Hey. Come here, man. Put your hands on your head for me. Did you hear shots fired here earlier? Do you got any— Oh, what's this? 512-S4 can you come in here? I got one with a gun.
>
> Defendant: I'm not re—
>
> Wickham: Put your hands behind your back.
>
> Defendant: I'm not resisting.

(*Id.* at 01:40–02:03.)

Wickham indicated that he detained Defendant as soon as he saw him. Wickham did not recall during the hearing if Defendant said anything in response to Wickham's question about hearing shots fired. Wickham testified that he said "Oh, what's this?" because Defendant's

12

shirt came up when Defendant put his hands on his head, and Wickham

simultaneously felt and saw the butt of a firearm in Defendant's pocket.

In his report, Wickham provided the following account of what happened:

> I advised [Defendant] I was patting him down. As I patted him
> down I held his hands above his head with my left hand and
> began patting him down. I immediately felt a hard object in
> his right pocket that felt like a gun. I could also see what
> appeared to be the grip of a handgun in his pocket.

(ECF No. 19-3, PageID.86.)

Wickham notified dispatch that Defendant had a gun,[10] and

Knoblauch entered the store. (*See id.*; ECF No. 19-4, PageID.88; ECF No.

19-5, 02:28–02:40; ECF No. 19-6, 01:53–02:10.) The officers handcuffed

Defendant (*see* ECF No. 19-5, 02:50–03:05; ECF No. 19-6, 02:11–02:23),

who told them that "you can get [the] gun out it's in my pocket." (ECF

No. 19-4, PageID.88; ECF No. 19-6, 02:00–02:10.) Defendant "stated that

he was not resisting" (*id.*; ECF No. 19-5, 02:40–02:50) and "indicated he

had another gun in his left pocket. Sgt. Knoblauch retrieved both guns

from [Defendant]. A silver and black handgun was taken from his right

pocket. An all black handgun was taken from his left pocket. Both

---

[10] The Dispatch Report contains an entry from "11:03:37 PM" that says: "1
W/GUN." (ECF No. 25-2, PageID.116, 119.)

handguns were loaded. [Defendant] advised he carried the guns for protection." (ECF No. 19-4, PageID.88; *see* ECF No. 19-3, PageID.86; ECF No. 19-5, 02:50–02:53, 03:05–03:20; ECF No. 19-6, 02:10–02:55.) An entry in the Dispatch Report from "11:07:01 PM" states: "PER S4-HAS SUBJ IN CUST W/ 2 GUNS ON HIM . . . ." (ECF No. 25-2, PageID.115, 119; *see* ECF No. 19-5, 05:40–06:45.)

Wickham told Defendant when he drove him in a police car to be "lodged" for a "CCW [Carrying a Concealed Weapon]" (ECF No. 19-6, 17:40–17:43) that he stopped Defendant because "we had shots fired" and "the description was Black males with black hoodies over their face or over their heads so I stopped to talk to you." (*Id.* at 18:11–18:30.)

Officers also stopped a different Black male that night. (*See* ECF No. 19-7.) He was wearing a black coat and a black hood over his head. (*See id.*) The officers told this person, who had already been stopped by an officer referred to as "Officer Schram," that he was being stopped because the officers believed he matched the description of the suspect they received from dispatch. (*See id.*)

## B. The Dispatch Report

Wickham testified that he was listening to the information from dispatch on the night of February 22, 2020. He indicated that "[d]ispatch is where 911 calls come in, and they direct us on where we need to go for calls." According to Wickham, people provide information to the dispatch center, and the dispatch center shares the information it receives with law enforcement officers. The Dispatch Report's entries from February 22, 2020 regarding the shots fired and the description of the suspects are discussed below.

### i.   The Shots Fired

Wickham testified that he heard from dispatch that shots were fired in the area of the 300 block of Morrell Street. The Dispatch Report contains the following entries that reference shots fired:

| Time | Description | User | Unit # | Machine |
|------|-------------|------|--------|---------|
| 10:56:18 PM | 30 GUNSHOTS PER S11 | Tingley, Alyssa | | CONVERSION |
| 10:56:33 PM | Call #: 8555 - 20 HEARD | Williams, Nicole[11] | | CONVERSION |

---

[11] Wickham testified that Nicole Williams is the dispatcher for the call reporting "20 HEARD."

15

| | | | |
|---|---|---|---|
| 10:56:47 PM | Call #: 8556 - 6 SHOTS | Polaczyk, Jacqueline | CONVERSION |
| 10:56:55 PM | Call #: 8555 - 2ND ST -- 28 HEARD NOTHING SEEN | Williams, Nicole | CONVERSION |
| 10:58:01 PM | AREA OF FRANKS POSS UP TO 4 DIFFERENT GUNS | Tingley, Alyssa | CONVERSION |
| 11:01:28 PM | 332 W MORRELL SAID SHE HAS HOLES IN HER HOUSE 517 960 5033 | Mclain, Charity | CONVERSION |
| 11:02:15 PM | 407 EDWARD 517 795 3358 HEARD 12 SHOTS SOUNDED LIKE AR 15 | Mclain, Charity | CONVERSION |

(ECF No. 25-2, PageID.116–117; *see id.* at PageID.120–121.)

Regarding the first entry reporting "30 GUNSHOTS," the government indicates that dispatch received this information from "a police officer in the area [who] radioed in that he heard 30 gunshots."

16

(ECF No. 25, PageID.101.) Wickham testified that "S11" (an abbreviation for "Sam 11") refers to Sergeant Postma from the Jackson City Police Department. Wickham heard Postma report that thirty shots had been fired southwest of his location. (*See* ECF No. 19-2, PageID.76 (Postma's report stating that "[w]hile on patrol downtown I heard 20-30 rapid gunshots coming from the southwest of my location. I advised 911 Dispatch and headed to the area.").) Other officers, including Knoblauch, heard the shots fired. (*See id.* at PageID.69; ECF No. 19-4, PageID.88; ECF No. 19-5, 08:20–08:30; ECF No. 19-6, 07:42–07:51, 16:39–16:46.) Wickham testified that he did not hear the gunshots himself. He testified that in his job he routinely relies on information provided by another law enforcement officer.

With respect to the entries in the Dispatch Report that begin with "Call #: 8555," Wickham testified that he does not know what "8555" means. He indicated that the entry reporting "20 HEARD" might be from a 911 call, and he guessed that this information came from a person who contacted dispatch from an outside line.[12] But Wickham "do[es]n't know

---

[12] Wickham pointed out an entry in the Dispatch Report from "10:57:06 PM" that states: "Call #: 8556 - 504 1ST-W OF RESD CAR SPEEDING OFF." (ECF No. 25-2, PageID.116.) Wickham believes that "8556" might appear in this entry—instead

for sure" if the person called a general telephone line or a line that is exclusively for 911 calls.

### ii.    The Description of the Suspects

Wickham testified that dispatch described the suspects as six Black males wearing all black and black hoodies. The entries in the Dispatch Report regarding this description are:

| Time | Description | User | Unit # | Machine |
|------|-------------|------|--------|---------|
| 10:58:54 PM | 6 BM LSW[13] ALL IN BLK | Tingley, Alyssa | | CONVERSION |
| 10:59:21 PM | BLK HOODIES ALL RUNNING TO GREENWOOD CEMETARY [sic] FROM UNION GREENWOOD | Tingley, Alyssa | | CONVERSION |

(ECF No. 25-2, PageID.116; *see id*. at PageID.120.)

The source of this information is unclear from the Dispatch Report, and the government does not identify where it came from in its response

---

of "8555"—because the information could have come from a different caller reporting something they had witnessed or heard.

[13] The government indicated during the hearing that "LSW" is possibly an abbreviation for "last seen wearing" or "left scene wearing."

18

brief. (*See* ECF No. 25, PageID.102.) At the hearing, the government was uncertain about the source of the information and the nature of these calls to dispatch.[14] Wickham guessed that the information came from a person who called 911. He indicated that dispatch receives information from 911 callers that it shares with law enforcement. He stated that if an entry in a dispatch report has a telephone number, that number is usually the caller's telephone number, which allows law enforcement to contact the caller to obtain more information. But Wickham did not know if the description of the suspects had a telephone number associated with it.

Knoblauch testified that a dispatch log shows a caller's telephone number, the time of the call, and the information provided by the caller,

---

[14] During the hearing, counsel for the government indicated that he did not know the source of the first entry—"6 BM LSW ALL IN BLK" from "10:58:54 PM"—"other than it is dispatch information" that was typed by a dispatcher, who "would be on the phone with a caller sending that information out in realtime to the deputies or the road patrol officers."

As for the source of the second entry—"BLK HOODIES ALL RUNNING TO GREENWOOD CEMETARY [sic] FROM UNION GREENWOOD" from "10:59:21 PM"—counsel assumed that this information came from a 911 caller whose telephone number appears in the previous entry. That entry is from "10:59:12 PM" and says: "517 414 3361." (ECF No. 25-2, PageID.116.) But counsel indicated that "I can't say that with certainty. I just don't know."

Counsel could not confirm to the Court that the calls to dispatch were 911 calls. He indicated that the government relied on the testimony of Wickham and Knoblauch regarding this issue.

which is entered by the dispatcher. In Knoblauch's experience, the absence of a telephone number could mean that the call came from a person with a blocked telephone number. Regarding the Dispatch Report's entry indicating that the suspects were running toward the cemetery, Knoblauch testified that he believes that the caller who provided this information "would have called 911 to update us as quickly as it was happening."

## II.  Legal Standard

The proponent of a motion to suppress "bears the burden of establishing that the challenged search [or seizure] violated his Fourth Amendment rights." *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (quoting *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)), *cert. denied*, 140 S. Ct. 580 (2019). "In response to a motion to suppress, the Government has the burden of demonstrating, by a preponderance of the evidence, that the search or seizure was constitutionally valid." *United States v. Chambers*, Criminal Action No. 13-20254, 2014 WL 1365691, at *4 (E.D. Mich. Apr. 7, 2014) (citing *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005)), *aff'd*, 638 F. App'x 437 (6th Cir. 2015); *see United States v. Goins*, No. 20-20545,

20

2021 WL 2351092, at *1 (E.D. Mich. June 9, 2021) ("When faced with a motion to suppress based on the Fourth Amendment, the government must establish by a preponderance of the evidence that the police conduct did not amount to an unreasonable search and seizure." (quoting *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974))).

## III. Analysis

The parties agree in their filings that Wickham had to have reasonable suspicion to stop Defendant,[15] but they disagree as to whether that standard was met. "A police officer may conduct a brief,

---

[15] In his motion, Defendant argues that Wickham conducted a *Terry* stop of Defendant without reasonable suspicion. (*See* ECF No. 19, PageID.48–49, 54.) *See infra* note 16. During the hearing, however, Defendant argued for the first time that the interaction between Wickham and Defendant was an official detention or an arrest that required probable cause, so it exceeded the scope of *Terry*. Because the Court finds that Wickham did not have reasonable suspicion to stop Defendant, Wickham did not have probable cause, which is a heightened standard. *See Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (stating that reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause" (quoting *Smoak v. Hall*, 460 F.3d 768, 778–79 (6th Cir. 2006)); *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (stating that the "reasonable-suspicion test . . . requires less than the 'probability or substantial chance of criminal activity' necessary for probable cause" (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018); citing *Alabama v. White*, 496 U.S. 325, 330 (1990)); 3A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 682 (4th ed. 2021) (stating that "police may do [*Terry* stops and frisks] without a warrant and based on less proof than probable cause").

investigatory stop [known as a *Terry*[16] stop] if he has 'reasonable suspicion' of a person's involvement in criminal activity—past, present, or future." *United States v. Moberly*, 861 F. App'x 27, 29 (6th Cir. 2021) (citing *Robinson v. Howes*, 663 F.3d 819, 828 (6th Cir. 2011)). The Sixth Circuit states that

> [a] *Terry* stop "must be based on specific, objective facts," *Brown v. Texas*, 443 U.S. 47, 51, 99 S. Ct. 2637, 61 L.Ed.2d 357 (1979), and requires that "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L.Ed.2d 621 (1981).

*Bazzi v. City of Dearborn*, 658 F.3d 598, 604 (6th Cir. 2011). The reasonable suspicion standard requires a level of suspicion that "is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "An 'inchoate and unparticularized

---

[16] In *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968), the Supreme Court held "that when a law enforcement officer has a reasonable, articulable suspicion that a person may be involved in criminal activity, he may, consistent with the Fourth Amendment, conduct a brief investigatory stop of the person." *United States v. Lewis*, 843 F. App'x 683, 690 (6th Cir. 2021).

suspicion or "hunch"' is not enough to support reasonable suspicion." *United States v. Abdi*, 827 F. App'x 499, 504 (6th Cir. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

The test for reasonable suspicion "is the totality of the circumstances," *Mitchell v. United States*, 233 F. App'x 547, 552 (6th Cir. 2007), that are "in place at the time of seizure." *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008)). "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *Siders v. City of Eastpointe*, 819 F. App'x 381, 388 (6th Cir. 2020) (quoting *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012)). The Sixth Circuit instructs that "[w]e . . . consider 'all of the information available to law enforcement officials at the time,'" and "[w]e look at the aggregate, not each factor or consideration in isolation." *United States v. Keeling*, 783 F. App'x 517, 521 (6th Cir. 2019) (internal citations omitted). As a result, "under the proper totality-of-the-circumstances approach, 'we must determine whether the individual factors, *taken as a whole*, give

rise to reasonable suspicion, *even if each individual factor is entirely consistent with innocent behavior when examined separately.*'" *United States v. Winters*, 782 F.3d 289, 301 (6th Cir. 2015) (emphasis in original) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001); citing *United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005)).

"Although the totality-of-circumstances test means that facts 'must be considered as a whole,' a proper evaluation of the relevant facts requires that each be 'examined in some orderly fashion.'" *United States v. Carter*, 558 F. App'x 606, 610 (6th Cir. 2014) (quoting *Smith*, 263 F.3d at 591). "Because this is an objective test, 'the officers' actual subjective motivations in effectuating the stop are irrelevant to the validity of the stop.'" *United States v. McElrath*, 786 F. App'x 575, 579 (6th Cir. 2019) (quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)). "Nonetheless, courts must give due weight to officers' factual inferences in deference to their specialized training, which allows them to make deductions that might well elude an untrained person." *United States v. Alexander*, 528 F. App'x 515, 519 (6th Cir. 2013) (citing *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008)).

Defendant argues that Wickham lacked reasonable suspicion to stop him because Wickham did so entirely based on dispatch's "vague" description of the suspects. (ECF No. 19, PageID.54; ECF No. 28, PageID.129, 132.) Defendant states that the source of the description was "an anonymous caller whose reliability could not be tested" (ECF No. 19, PageID.54) and that the "tip's barebones description did not provide sufficient indicia of reliability to create reasonable suspicion to stop [Defendant]." (*Id.* at PageID.44.) Defendant also states that the description "was not sufficiently particular" (*id.*) because it "could match too broad a swath of people to create reasonable, particularized suspicion of criminal activity." (ECF No. 28, PageID.131.) Defendant states that the description "could, and at times did, allow other officers to stop any black man wearing dark clothing within a half mile radius from where the shots were fired—an area where over 2,000 black people lived in 2010." (ECF No. 19, PageID.53–54.) According to Defendant, "[a]part from the dispatcher's untested overbroad description, Wickham had no reason to suspect [Defendant] of criminal activity." (*Id.* at PageID.54.)

In its response, the government disputes that "the tip" was anonymous. (ECF No. 25, PageID.108–109.) The government also

25

disputes that the tip was the sole basis for the stop. Its position is that "under the totality of the circumstances, Deputy Wickham had a particularized and objective basis for detaining" Defendant (*id.* at PageID.107) and had "reasonable and articulable suspicion that the defendant was involved in criminal activity." (*Id.* at PageID.108.)

The government argues that Wickham had reasonable suspicion to stop Defendant based on the following factors: (1) Wickham "rel[ied] on information from dispatch that multiple shots had been fired in a residential area," (2) Wickham was "provided a description that the suspects were black males dressed in black and wearing black hoodie sweatshirts," (3) "the time of the incident is in the late evening hours, when less people are usually outside," (4) the shots were fired in a high crime area, (5) Wickham encountered Defendant "less than six minutes[] after the initial dispatch call," which "is an extremely short period of time," (6) Wickham "encounter[ed] the two individuals . . . within a short distance from the scene of the shooting," (7) "the other individual who was with the defendant in the parking lot and detained outside the store, admitted to being on the same street as the home that was targeted," and (8) Defendant and the other individual made "a furtive movement" by

26

entering the store after they saw Wickham. (*Id.* at PageID.107.) The Court finds that these factors, considered separately and together, did not give Wickham reasonable suspicion to stop Defendant. Therefore, the government has failed to meet its burden of showing that Wickham's stop of Defendant was constitutionally valid.

## A. Dispatch's Report that Multiple Shots Were Fired and Dispatch's Description of the Suspects

The first two factors identified by the government—that Wickham relied on dispatch's information that multiple shots were fired and that Wickham was given a description that the suspects were Black males dressed in all black and wearing black hoodies—involve tips that informants provided to dispatch and that dispatch then communicated to Wickham and other officers.

"Reasonable suspicion need not arise from an officer's own observations." *Williams v. Leatherwood*, 258 F. App'x 817, 821 (6th Cir. 2007) (internal citation omitted). It "can be based on a tip from an informant or information provided to officers by the police dispatcher." *United States v. Farrington*, 795 F. App'x 404, 408 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 2657 (2020). Regarding a tip from an informant, the Sixth Circuit states:

> By itself to provide reasonable suspicion to make the investigatory stop, an informant's tip must provide sufficient "indicia of reliability," *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972), to warrant "reasonable, articulable suspicion" of criminal activity, *Place*, 462 U.S. at 702, 103 S. Ct. 2637.

*Bazzi*, 658 F.3d at 604–05. The Sixth Circuit also states that

> [a] tip—anonymous or not—may furnish reasonable suspicion necessary to justify an investigatory stop. *Alabama v. White*, 496 U.S. 325, 332, 110 S. Ct. 2412, 110 L.Ed.2d 301 (1990); *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983). Such a tip must pass muster under *Gates*, which directs us to consider an informant's "veracity," "reliability," and "basis of knowledge." 462 U.S. at 230, 103 S. Ct. 2317. We have also recognized "subsequent corroboration of the [informant's] tip," *United States v. Smith*, 182 F.3d 473, 478 (6th Cir. 1999), and whether an informant is known or anonymous, *United States v. May*, 399 F.3d 817, 823 (6th Cir. 2005), as relevant factors. These considerations are not independent requirements; instead we consider them under the totality of the circumstances. *Gates*, 462 U.S. at 230, 103 S. Ct. 2317.

*Keeling*, 783 F. App'x at 521 (alteration in original).

The Sixth Circuit has found an anonymous tip to be sufficiently reliable in a reasonable suspicion analysis if "the informant's identity was easily ascertainable . . . by the police." *United States v. Jackson*, 700 F. App'x 411, 414–15 (6th Cir. 2017) (alteration in original) (quoting

*United States v. Long*, 464 F.3d 569, 574 (6th Cir. 2006)). An informant's identity may be "easily ascertainable" if the police know the informant's telephone number, address, or what the informant looks like. *See id.* (citing *Navarette*, 572 U.S. at 400; *Long*, 464 F.3d at 574) (concluding that an informant's tip "had sufficient indicia of reliability" because the informant's "identity was 'easily ascertainable' [given that] police were aware of where she lived and what she looked like" and noting that in *Navarette*, a Supreme Court case in which an anonymous 911 caller's tip was found to be reliable, "all the police had was a phone number"). "What is important is that the police kn[o]w where to look for the informant and that the informant [i]s aware of this fact." *Id.* at 415 (citing *Navarette*, 572 U.S. at 400–01; *Florida v. J.L.*, 529 U.S. 266, 270 (2000); *Long*, 464 F.3d at 573).

When information comes from dispatch, the "information relayed from the police dispatcher is imputed to the individual officers" in "determining the reasonableness of a *Terry* stop." *Farrington*, 795 F. App'x at 409 n.3 (internal citations omitted). This means that

> if the dispatcher had sufficient information to find reasonable suspicion for a *Terry* stop, the stop was permissible. But if the dispatcher lacked sufficient information to satisfy the reasonable suspicion requirement, and the officers'

subsequent observations did not produce reasonable suspicion, then the stop violated [the individual's] Fourth Amendment rights.

*Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003) (citing *United States v. Hinojos*, 107 F.3d 765, 767 (10th Cir. 1997)).

### i.   *Dispatch's Report that Multiple Shots Were Fired*

With respect to the government's first reasonable suspicion factor—that Wickham relied on dispatch's information that multiple shots were fired—dispatch's information about shots fired came from Postma and possible 911 callers. At least two entries in the Dispatch Report related to the shots fired contain a telephone number. (*See* ECF No. 25-2, PageID.116–117; *see id.* at PageID.120–121.) Based on Wickham's and Knoblauch's testimony, the telephone number likely belongs to the 911 caller who provided the information that appears in the entry. As a result, dispatch received information about the shots fired from at least two 911 callers whose identities are "easily ascertainable," which is an indicator of reliability. *Jackson*, 700 F. App'x at 414–15. That shots were fired was corroborated by other officers, including Knoblauch, who heard the gunshots themselves. Wickham testified that in his job he routinely relies on information provided by another officer. Given that the shots

30

fired were reported by at least two 911 callers whose identities are easily ascertainable and that officers corroborated that shots were fired, it was reasonable for Wickham to suspect that criminal activity had taken place. *See Williams*, 258 F. App'x at 821 (finding that an officer who responded to a dispatch involving "an incident of 'road rage'" reported by 911 callers had sufficient facts "to raise a reasonable belief that a crime had occurred"). Moreover, Defendant does not dispute that twenty to thirty shots were fired near 332 West Morrell Street at around 10:55 p.m. on February 22, 2020. (*See* ECF No. 19, PageID.42.) Defendant recognizes that the shots fired "may have supported a reasonable suspicion that criminal activity had occurred in the area." (ECF No. 28, PageID.132.)

### ii.  *Dispatch's Description of the Suspects*

The second reasonable suspicion factor identified by the government is that Wickham was given a description that the suspects were Black males dressed in all black and wearing black hoodies. As noted, Defendant challenges the tips that described the suspects on the basis that the tips did not provide sufficient indicia of reliability to

31

establish reasonable suspicion and did not give Wickham particularized suspicion to justify the stop. These arguments are discussed below.

### a.  *Sufficient Indicia of Reliability*

Defendant argues that the tips describing the suspects were from anonymous callers "whose reliability could not be tested" (ECF No. 19, PageID.54) and that the tips' "barebones description did not provide sufficient indicia of reliability to create reasonable suspicion to stop [Defendant]." (*Id.* at PageID.44.) In its response, the government acknowledges that "courts have found [anonymous tips] to be insufficient to provide reasonable suspicion where the tip was entirely anonymous," but it disputes that "the tip" at issue was anonymous because

> here the information was supported by at least one officer who advised dispatch that they personally heard the shots and their location and at least some of the 911 callers provided contact information, including the occupant of the home that was targeted. Courts have found tips to be sufficient to establish probable ca[u]se [sic] where a 911 caller provided his or [sic] identifying information and predictive information, and where police independently corroborated the tip.

(ECF No. 25, PageID.108–109 (citing *White*, 496 U.S. at 330; *Robinson*, 663 F.3d at 829; *Campbell v. Stamper*, 244 F. App'x 629, 631–32 (6th Cir. 2007).) The government also argues that "[t]he tip here was accompanied

by sufficient indicia of reliability and was not exclusively anonymous"

because

> [o]ne of the sources was a fellow officer who heard the shots
> fired. He therefore provided a basis for Deputy Wickham to
> conclude that criminal activity was indeed taking place.
> Second, Deputy Wickham was provided with an address on
> Morrell Street through dispatch which included information
> that can reasonably be inferred was from the occupant of the
> targeted home. (Exhibit A, Dispatch Log). This information "is
> an indicium of reliability that adds to the totality of the
> circumstances and distinguishes the call from the completely
> unidentifiable tipster." *Robinson*, 663 F.3d at 829 (finding call
> made by a citizen-tipster, who was an eyewitness to the
> events he reported to the police and who provided his address
> to the police dispatcher provided indicia of reliability).

(*Id.* at PageID.109–110.) But as Defendant points out, "the government

has not addressed the anonymous nature of the tips about the suspect

descriptions." (ECF No. 28, PageID.130.) The government does not show

that the tips describing the suspects were provided by 911 callers who

gave their contact information (or any other identifying information). The

government also does not show that the tips contain predictive

information or that the tips were independently corroborated by the

police.

Wickham and Knoblauch testified that the tips describing the suspects likely came from 911 callers. But the identities of the 911 callers are not "easily ascertainable" because the entries in the Dispatch Report that describe the suspects do not include a telephone number, address, or any other information that would allow their identities to be determined. *Jackson*, 700 F. App'x at 414–15. (*See* ECF No. 25-2, PageID.116; *see id.* at PageID.120.) The Supreme Court has concluded that a "caller's use of the 911 emergency system" is an "indicator of veracity" for purposes of determining reliability because "[a] 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette*, 572 U.S. at 400–01. *See United States v. Harris*, No. 18-20833, 2019 WL 1034216, at *3 (E.D. Mich. Mar. 5, 2019) (stating that "a 911 call is not inherently equivalent to an anonymous tip" and finding that one 911 call "was a far more reliable indicator of criminal activity than the run of the mill anonymous tip" because the caller "provided her name, address, and telephone number; she was also contemporaneously reporting an event she was witnessing"). Therefore, the tips describing the suspects may be more reliable than an anonymous tip not provided

34

through the 911 emergency call system, but they lack sufficient indicia of reliability to provide reasonable suspicion on their own because identifying information for the callers is unavailable.

The Supreme Court has stated that

> [u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, *see Adams v. Williams*, 407 U.S. 143, 146–147, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S., at 329, 110 S. Ct. 2412.

*J.L.*, 529 U.S. at 270. But "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Id.* (quoting *White*, 496 U.S. at 327). In other words, "[w]here a tip cannot be verified because it is anonymous, the Supreme Court recognizes the probative value of 'corroboration of details of an informant's tip by independent police work.'" *Robinson*, 663 F.3d at 828 (quoting *Gates*, 462 U.S. at 241); *see Keeling*, 783 F. App'x at 522 ("Independent corroboration of a tip further augments an informant's reliability." (citing *Navarette*, 572 U.S. at 398)). The Sixth Circuit explains that

[*Alabama v.*] *White* provides an example of when the Supreme Court has found that police officers sufficiently corroborated an anonymous tip to provide reasonable suspicion for a *Terry* stop. In that case, a police officer received an anonymous telephone call stating that the defendant would be leaving a specific apartment building at a particular time in a brown Plymouth station wagon with the right tail light broken, driving to an identified motel, and have an ounce of cocaine inside a brown attaché case. *Id.* at 327, 110 S. Ct. 2412. The police proceeded to this apartment building and saw a brown Plymouth station wagon with a broken right tail light in the parking lot in front of the building. *Id.* The officers observed the defendant leave the building, carrying nothing in her hands, and enter the station wagon. *Id.* They followed the vehicle as it drove the most direct route to the motel that the caller had described. *Id.* The officers stopped the station wagon just before it reached the motel, and the defendant consented to a search of the car, which uncovered a brown attaché case containing marijuana. *Id.* Additionally, during processing at the police station, a small amount of cocaine was found in the defendant's purse. *Id.*

The Court held that although the anonymous tip offered no way to determine whether the caller was honest or reliable, the officers sufficiently corroborated the tip to have reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 331, 110 S. Ct. 2412. The Court also deemed it important that "the anonymous tip contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *Id.* at 332, 110 S. Ct. 2412 (citation omitted). Ultimately, "[a]lthough it [was] a close case," the Court concluded that "under the totality of

the circumstances[,] the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of respondent's car." *Id.*

*Srisavath v. City of Brentwood*, 243 F. App'x 909, 913–14 (6th Cir. 2007).

Further, the Supreme Court and the Sixth Circuit have determined that an anonymous tip that describes a suspect lacks sufficient indicia of reliability if it does not contain predictive information or does not allege criminal activity. "[U]nlike tips that predict future movements or indicate some inside knowledge of the criminal activity, mere descriptions of outwardly observable facts provide no indication of a 'special familiarity' with the criminal behavior that suggests reliability." *Feathers*, 319 F.3d at 849 (quoting *White*, 496 U.S. at 332). And police do not have reasonable suspicion for a *Terry* stop merely because they encounter an individual who matches a description from an anonymous tip. *See id.* at 850; *J.L.*, 529 U.S. at 271–72. Two cases that Defendant relies on—*Florida v. J.L.*, 529 U.S. 266 (2000), and *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003)—illustrate these points. *J.L.* and *Feathers* and are discussed below.

In *J.L.*, an anonymous caller in an unknown location reported to the police "that a young black male standing at a particular bus stop and

37

wearing a plaid shirt was carrying a gun." 529 U.S. at 268, 270. Two officers arrived at the bus stop approximately six minutes later and "saw three black males 'just hanging out [there].'" *Id.* at 268 (alteration in original). One of the males, J.L., was wearing a plaid shirt, but "[a]part from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements." *Id.* An officer told J.L. to put his hands up, frisked him, and found a gun in his pocket. *See id.* J.L. "was charged under state law with carrying a concealed firearm without a license and possessing a firearm while under the age of 18." *Id.* at 269. J.L. "moved to suppress the gun as the fruit of an unlawful search." *Id.*

The Supreme Court affirmed the lower court's finding that the search of J.L. was invalid under the Fourth Amendment. *See id.* The Court concluded that the tip in *J.L.*

> lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case. The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew

> before they conducted their search. All the police had to go on
> in this case was the bare report of an unknown, unaccountable
> informant who neither explained how he knew about the gun
> nor supplied any basis for believing he had inside information
> about J.L. If *White* was a close case on the reliability of
> anonymous tips, this one surely falls on the other side of the
> line.

*Id.* at 271.

In *J.L.*, the Court rejected the argument that "the tip was reliable because its description of the suspect's visible attributes proved accurate." *Id.* The Court stated that "[a]n accurate description of a subject's readily observable location and appearance . . . will help the police correctly identify the person whom the tipster means to accuse"; however, "[s]uch a tip . . . does not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272. The Court stated that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* (internal citation omitted).

In *Feathers*, a 911 call made at 1:25 a.m. reported that

> moments earlier, a white male with a beard on a porch on
> North Howard Street had pointed something at the caller and
> told the caller to shut up. The caller said that the individual
> "looks like he is pretty drunk," and said that although he
> didn't know the address from which the individual had

39

spoken, the house was two houses from the corner. . . . The caller, who claimed that he was just walking along the street when the individual spoke to him, refused to identify himself by name but suggested that "you can have somebody come by here." . . . The dispatcher then instructed a patrol car near the area to approach 708 North Howard Street and "check for a signal 9, supposed to be carrying a weapon. . . . Signal 9 is on the porch near the corner, it's a white male with a beard, no shirt, possible 4, he pointed something at a caller, so he possibly has a weapon."[1]

_____

[1] According to the officers' brief, a signal 9 is a suspicious person, and a signal 4 is an intoxicated person.

319 F.3d at 846 (internal citations omitted).

The two officers who responded to the call saw someone on a porch they believed matched the dispatcher's description, and they stopped their car at 728 North Howard Street. *See id.* The individual, Thomas Feathers, and his wife were standing on one side of the porch and were hugging each other. *See id.* The officers came toward the porch and shouted to Feathers that he move to the other side of the porch. *See id.* Feathers complied. *See id.* The officers then ordered Feathers to take his hands out of his pockets without answering Feathers's wife's questions as to why the officers were there. *See id.* The officers ordered Feathers to take his hands out of his pockets a second time, and Feathers did so, but

40

he put his hands back in his pockets. *See id.* The officers ordered him to take his hands out of his pockets a third time. *See id.* Feathers turned away, took his hands out of his pockets, and walked back to the door of his house. *See id.* Feathers opened the door with his right hand, leaned into his house, and told his father, who was inside the house, to "come outside quickly" with their video camera. *Id.* The officers then "ran up the porch stairs and seized [Feathers] from behind while he was leaning into his house. [The officers] each grabbed one of his arms and pinned him, face-forward, against a pillar." *Id.* Other officers arrived, and they helped the two officers "wrestle Feathers to the ground, face down, where they handcuffed him. At that point, the newly arriving officers stated that they could smell alcohol on Feathers's breath." *Id.* at 847. Feathers was taken to a police car, and "[w]hen the officers searched his pockets, they found that Feathers, a carpenter, had a Leatherman utility knife in his pocket. Feathers was charged with assault against a peace officer, carrying a concealed weapon, and resisting arrest." *Id.* Feathers challenged the actions of the two officers under 42 U.S.C. § 1983 and alleged that "the officers' initial *Terry* stop violated his Fourth Amendment rights." *Id.* at 848.

41

The Sixth Circuit found that the officers "did not have sufficient information to support a finding of reasonable suspicion," *id.* at 849, and concluded that the *Terry* stop "violated Feathers's Fourth Amendment rights." *Id.* at 850. The court stated that the 911 caller who "led the police to North Howard Street refused to leave his name, and the Supreme Court has expressly held that when an anonymous tip is neither supported with indicia of reliability nor corroborated with police observation, it cannot provide an officer reasonable suspicion for a *Terry* stop." *Id.* at 849 (citing *J.L.*, 529 U.S. at 271). Moreover,

> the caller did not provide the dispatcher sufficient information to support a reasonable suspicion. The caller's suggestion, after refusing to leave his name, that the police could 'have somebody come by here,' . . . hardly provides the reliability that comes from an identified or repeat informant. *See Gates*, 462 U.S. at 228–29, 233–34, 103 S. Ct. 2317 (suggesting that tip might be made more reliable if it came from an informant "known for the unusual reliability of his predictions" or from "an unquestionably honest citizen," neither of which was present here). Similarly, the informant offered no future predictions or inside information that would suggest a special knowledge of Feathers's allegedly criminal activity. Indeed, the anonymous tipster did not even allege *any* criminal activity; it was the dispatcher, not the tipster, who suggested that Feathers might be carrying a weapon. The caller said only that Feathers pointed "something" at him, but that the caller "d[id]n't know what he pointed," . . . a comment

that the dispatcher reported as "supposed to be carrying a weapon" . . . . Accordingly, if the basis for the *Terry* stop is the information in the dispatch alone, then the detention lacked reasonable suspicion.

*Id.* at 850 (emphasis in original).

The court rejected the officers' claim that "the 'totality of the circumstances' justified their search" because the court found that the officers' "corroboration" of Feathers's appearance and location, in addition to the information from dispatch, was insufficient to give the officers reasonable suspicion for the *Terry* stop:

Indeed, if the[] [officers'] observations, when combined with the information provided to the dispatcher, supported a finding of reasonable suspicion, the detention would be permissible. The officers suggest that by corroborating the information from the tip, and finding a shirtless white male on North Howard Street, they were able to form a reasonable suspicion that justified a *Terry* stop. However, the only information that they corroborated is precisely the information that the Supreme Court ruled fails to support reasonable suspicion in an anonymous tip. Feathers's identity consisted of "easily obtained facts and conditions existing at the time of the tip, [not] future actions of third parties ordinarily not easily predicted." *White*, 496 U.S. at 332, 110 S. Ct. 2412. Even when taken as a whole, the totality of the circumstances here do not support a finding of reasonable suspicion. An anonymous tip that an individual pointed something at a tipster does not support a finding of reasonable suspicion even when police find the described individual in

the relevant area. The *Terry* stop thus violated Feathers's Fourth Amendment rights.

*Id.*

Here, the anonymous tips are like the anonymous tips in *J.L.* and *Feathers* that were found to be insufficiently reliable to support reasonable suspicion. The tips describing the suspects in this case came from unknown sources, and the tips contain no predictive information that would have allowed the officers to verify the informants' knowledge or credibility. The tips also do not allege criminal activity because they make no mention of a shooting or a shooter. And under *J.L.* and *Feathers*, Wickham did not have reasonable suspicion to stop Defendant merely because Defendant matched the description dispatch received from anonymous tips. The tips in this case were not independently corroborated, like the tip in *White*, such that Wickham had reasonable suspicion to stop Defendant.

In *Srisavath v. City of Brentwood*, the Sixth Circuit determined that an officer named "Richardson lacked the reasonable suspicion necessary for a *Terry* stop, and the stop violated [an individual's] constitutional rights," because

44

> Richardson stopped [the individual's] car on the basis of an
> anonymous tip that provided only a vague description of
> possible suspects, described no ongoing criminal activity, and
> offered no prediction of future activity that could be used to
> determine the tipster's veracity and reliability. Once on the
> scene, Richardson did not corroborate the tip and observed no
> criminal activity to justify stopping [the individual's] car.

243 F. App'x at 918. The court stated that "when anonymous tips provide

the police with vague information that is not predictive of future illegal

activity, this Court refuses to hold that officers have reasonable suspicion

to conduct a *Terry* stop." *Id.* at 915. For the same reasons that the

anonymous tip in *Srisavath* did not give the officer reasonable suspicion

to stop the individual in that case, the anonymous tips describing the

suspects in this case did not give Wickham reasonable suspicion to stop

Defendant.

The government argues that because "the tip was reporting what

the caller perceived to be an ongoing emergency," this "increases the

indicia of reliability." (ECF No. 25, PageID.110.) The only Sixth Circuit

case the government cites to is *Robinson v. Howes*, 663 F.3d 819 (6th Cir.

2011). In *Robinson*, a different shots fired case, the Sixth Circuit stated

that it "ha[s] not yet addressed whether a tip reporting an ongoing

emergency is entitled to a greater degree of reliability than a non-

45

emergency tip," but it concluded based on a Second Circuit case that "the emergency nature" of a 911 call reporting a shooting "adds to the totality of the circumstances comprising reasonable suspicion." *Id.* at 830 (citing *United States v. Simmons*, 560 F.3d 98, 105 (2nd Cir. 2009)). And in *United States v. Bonner*, a case in which a 911 caller "reported a shooting rather than mere gun possession," Judge George Caram Steeh concluded that "[t]he emergency nature of the call . . . adds to a finding of reasonable suspicion." No. 19-20719, 2020 WL 830880, at *3 (E.D. Mich. Feb. 20, 2020) (citing *Robinson*, 663 F.3d at 830; *Simmons*, 560 F.3d at 105). But in this case, the government's argument fails because the entries in the Dispatch Report that describe the suspects do not mention a shooting or a shooter, so the 911 calls did not have an "emergency nature."[17]

Defendant argues that it was improper for Wickham to act entirely based on the anonymous tips describing the suspects. Defendant states

---

[17] At the hearing, counsel for the government stated that "common sense" connects the description of the suspects to the shots fired. However, when asked about an entry in the Dispatch Report from "11:01:07" p.m., counsel indicated that he believed the entry was from a 911 call unrelated to the shots fired because he "requested all the logs for this timeframe." The entry from 11:01:07 p.m. states: "336 uniion st had subj banging on the front door subj left unk further complt cierra dettman wants cont called in on a 911 only." (ECF No. 25-2, PageID.116, 120.) Given that the Dispatch Report apparently contains entries related to other incidents, it is difficult for the Court to know which entries in the Dispatch Report relate to the shots fired and which entries do not.

46

that in two other Sixth Circuit "shots fired cases"—*United States v. Caruthers*, 458 F.3d 459 (6th Cir. 2006), and *Mitchell v. United States*, 233 F. App'x 547 (6th Cir. 2007)—the officers had additional reasons beyond an anonymous tip to suspect criminal activity, but Wickham did not. (ECF No. 19, PageID.51.)

In *Caruthers*, a dispatcher created a written report based on an anonymous emergency call received at approximately 1:15 a.m. *See* 458 F.3d at 462. The report stated: "Male black. . . . Red shirt, shorts, fired gun in the air, arguing with female at location, gun is in the suspect's pocket, fired the weapon once. . . . LO[cation], J.C. Napier." *Id.* (alterations in original) (internal citations omitted). Two officers arrived at an intersection where J.C. Napier public housing development is located within five minutes of being dispatched to that location. *See id.* The only person they saw in the area was a Black male wearing a red shirt, who was later identified as Ricky A. Caruthers. *See id.* Caruthers was "entering the parking lot of a nearby gas station" and "walking in the direction away from the J.C. Napier development." *Id.* One officer drove his police car alongside Caruthers (a few feet away from Caruthers), rolled down the car's window, and tried to talk to Caruthers.

47

*See id.* Caruthers "took off in a hurried[] fashion around the corner of the business," and the officer, who had exited his car to chase Caruthers, eventually saw Caruthers "kind of hunched down a little bit" and "kind of leaning toward the ground." *Id.* The officer asked Caruthers to "come here," and Caruthers complied. *Id.* The officer "grabbed ahold of [Caruthers]" and placed Caruthers in the police car. *Id.* The officer then went to where he saw Caruthers hunch over, and in that spot, he found a loaded pistol "laying on the ground in plain view." *Id.* The officer took Caruthers out of the police car, patted Caruthers down, and found a bullet in Caruthers's pants pocket. *See id.* at 463. The officer placed Caruthers in handcuffs and arrested him. *See id.* The other officer "immediately found five more rounds in the back seat" of the police car. *Id.* Caruthers "was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 924." *Id.* He "moved to suppress the ammunition and statements." *Id.* (footnote omitted).

The Sixth Circuit determined in *Caruthers* that the totality of the circumstances "amounted to reasonable suspicion." *Id.* at 465. The court found that the tip was similar to the tip in *J.L.* in that the caller "was anonymous and gave a general description of an alleged gun-wielder's

48

appearance and location." *Id.* But the tip "was even vaguer than the one in *J.L.*, as it included a less precise location and lacked any indication of the individual's age." *Id.* The court therefore concluded that "there is no doubt that the stop of Caruthers would have been impermissible if it had been justified solely by the anonymous call." *Id.* But the court's analysis did not end there. The court stated that it was not appropriate to

> simply dismiss the anonymous call altogether where, as here, other suspicious circumstances also existed. The Supreme Court has explicitly instructed courts to avoid the approach of giving certain factors "no weight," because the "evaluation and rejection of . . . factors in isolation from each other does not take into account the totality of the circumstances." *Arvizu*, 534 U.S. at 274, 122 S. Ct. 744 (internal quotation marks omitted).

*Id.*

In considering how much weight to give the anonymous tip in its reasonable suspicion analysis, the Sixth Circuit noted the anonymous nature of the tip, that the tip was corroborated only to the extent that it accurately described Caruthers's physical appearance and location, that the tip did not contain predictive information, and the Supreme Court's concerns about anonymous tips:

> An anonymous tip is less reliable than "a tip from a known informant whose reputation can be assessed and who can be

held responsible if her allegations turn out to be fabricated." *J.L.*, 529 U.S. at 270, 120 S. Ct. 1375. Although the tip here was corroborated in the sense that it accurately described Caruthers's "readily observable location and appearance," reasonable suspicion "requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person." *Id.* at 272, 120 S. Ct. 1375 (emphasis added). Because the tip otherwise "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility," it lacked even "moderate indicia of reliability." *Id.* at 271, 120 S. Ct. 1375. A sister court of appeals has effectively articulated two reasons underlying the Supreme Court's skeptical view of anonymous tips like the one here:

> The first concern relates to the motives of the tipster. A tipster who refuses to identify himself may simply be making up the story, perhaps trying to use the police to harass another citizen. . . . A second concern relates not to a tip's anonymity but to its level of specificity. Overly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens. . . . [A] tip [like the one in *J.L.*] could, obviously, give police an excuse to stop and search a large number of young men. The Court's insistence on additional detail from the tipster and corroborating observation by the police helps ensure that police do not use vague tips to violate the Fourth Amendment rights of innocent citizens.

*United States v. Johnson*, 364 F.3d 1185, 1190–91 (10th Cir. 2004). In light of these concerns, we give the anonymous call little weight in the reasonable-suspicion calculus.

*Id.* at 465–66 (alterations in original). The court found, however, that other factors provided reasonable suspicion for the *Terry* stop; namely, Caruthers fleeing from the officer and immediately "hunching down," which together was characterized as "furtive conduct" that "could reasonably suggest that Caruthers fled from [the officer] so that he could discard a weapon or other contraband," and that the encounter took place late at night in a high crime area. *Id.* at 466–68. In summarizing its findings, the court stated that "the totality of the circumstances—an individual, whose general appearance and location matched the description given in the anonymous shot-fired call, fled and made furtive movements when approached by the police late at night in a high-crime area—provided reasonable suspicion to conduct a *Terry* stop." *Id.* at 468.

In *Mitchell*—the other case Defendant argues is distinguishable from this case because the officers in *Mitchell* had additional reasons beyond an anonymous tip to suspect criminal activity (*see* ECF No. 19, PageID.51)—the police "received a call [just before 10:00 p.m.] that gunshots were being fired by six black males in dark clothing in the Auburn Oaks Apartment complex." *Mitchell*, 233 F. App'x at 548. The two officers who responded to the call encountered a single individual

51

named Alfonzo Michell who was standing at the back of the complex. *See id.* Mitchell is an African American male and was wearing dark clothing. *See id.* The officers approached Mitchell on foot without their guns drawn and asked him (1) "whether he had heard any shooting" and (2) "whether he had a gun." *Id.* at 548–49. When Mitchell answered "yes" to the second question, one of the officers frisked Mitchell, took the gun from Mitchell's pants pocket, and put Mitchell in a police car. *Id.* at 549. "Mitchell was not handcuffed until this point." *Id.* Because the gun was found to be not stolen, "Mitchell was issued a misdemeanor citation and released." *Id.* Seven months later, he was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). *See id.* "Mitchell filed a motion to suppress any statements made, but did not move to suppress the gun." *Id.* He argued that the officers lacked reasonable suspicion to detain him and that the officers' initial stop was a *Terry* stop. *See id.*

The Sixth Circuit found that "the initial encounter—when the officers approached and asked Mitchell if he heard shots and if he had a gun—was a consensual encounter" and that the officers seized Mitchell when they frisked him. *Id.* at 550–51. The court determined that at the

time of the frisk, the officers had reasonable suspicion based on the totality of the circumstances because the officers

> had received an anonymous tip that six black males, dressed in dark clothing, were firing shots in the Auburn Oaks Apartment complex. Within several minutes of the call, they encountered Mitchell, a lone black male, at the complex. And, most important, Mitchell acknowledged that he had a weapon on him. Considering the totality of these circumstances, the officers were not only entitled to investigate further, but also to ensure their safety in the process by removing the gun.

*Id.* at 551 (internal citation omitted).

> The Sixth Circuit distinguished *Mitchell* from *Caruthers* because
>
> the "stop" in [*Mitchell*] did not occur until the officers frisked Mitchell, and at that point the officers had a reasonable and articulable suspicion based on the totality of the circumstances, including most notably the fact that Mitchell said he had a gun. Thus, the seizure was not based merely on an anonymous tip with some descriptive information of a subject's readily observable location and appearance.

*Id.* at 551–52 (internal citations omitted).

Thus, in *Caruthers* and *Mitchell*, a finding of reasonable suspicion was not based entirely on a tip describing a suspect's physical appearance and location; rather, additional factors—an individual's furtive conduct in response to police presence or an individual communicating to police that he had a gun—contributed to the existence of reasonable suspicion.

Those factors are not present here because Defendant did not make a furtive movement upon seeing Wickham, and Defendant did not tell Wickham he had a gun prior to being stopped. As noted, the government identifies other factors that it believes justify the stop, but these factors are insufficient to establish reasonable suspicion when considered alone or together with the anonymous tips describing the suspects, as discussed below.

In sum, anonymous 911 callers gave dispatch a description of the suspects that Wickham believed matched Defendant. These anonymous tips lack sufficient indicia of reliability because the identities of the 911 callers are not easily ascertainable, the tips were not independently corroborated beyond corroborating that Defendant matched the physical description of the suspects provided by dispatch, the tips did not contain predictive information, and the tips did not allege criminal activity. As noted,

> an anonymous tip does not exhibit sufficient indicia of reliability merely because it provides "[a]n accurate description of a subject's readily observable location and appearance," *J.L.*, 529 U.S. at 272, 120 S. Ct. 1375, as such a tip "provide[s] no predictive information and therefore [leaves] the police without means to test the informant's knowledge or credibility," *id.* at 271, 120 S. Ct. 1375. *See also*

> *United States v. Patterson*, 340 F.3d 368, 370–72 (6th
> Cir.2003) (applying the holding of *J.L.* to similar
> circumstances); *Feathers v. Aey*, 319 F.3d 843, 849–50 (6th
> Cir. 2003) (same); *Northrop v. Trippett*, 265 F.3d 372, 381–83
> (6th Cir. 2001) (same), *cert. denied*, 535 U.S. 955, 122 S. Ct.
> 1358, 152 L.Ed.2d 354 (2002).

*United States v. Cohen*, 481 F.3d 896, 899–900 (6th Cir. 2007). The Sixth

Circuit instructs that "[s]uch a tip is not irrelevant in evaluating the

totality of the circumstances, but should be given little weight." *Id.* at 900

(citing *Caruthers*, 458 F.3d at 465–66). Therefore, the tips describing the

suspects in this case are insufficient, on their own, to establish

reasonable suspicion, and dispatch's description of the suspects is given

little weight in the totality-of-the-circumstances analysis.

## b.  Particularized Suspicion

Defendant also challenges the stop on the basis that the anonymous

tips' description of the suspects "was not sufficiently particular." (ECF

No. 19, PageID.44.) He argues that the description "could not have

provided Deputy Wickham with sufficiently particularized suspicion that

[Defendant] was involved in criminal activity." (ECF No. 28,

PageID.129.) According to Defendant, "the anonymous tip leading to [the]

stop could be used to stop every black man wearing dark clothing within

55

a half mile radius east of 332 W. Morrel[l] Street." (ECF No. 19, PageID.53.) Defendant states that the United States Census reflects that in 2010, "over 2,000 black people lived" "within a half mile radius from where the shots were fired."[18] (*Id.* at PageID.53–54; ECF No. 28, PageID.131.) Defendant notes that on the night the shots were fired, officers stopped "an older black man wearing dark, though not black, pants, a black jacket with a feathery hood, and a black hoodie underneath." (ECF No. 19, PageID.53 (citing ECF No. 19-7).)

In its response, the government argues that Wickham "had a particularized and objective basis for detaining the defendant" (ECF No. 25, PageID.107), but it does not address Defendant's argument regarding

---

[18] Defendant states that

[a]ccording to the United States Census, in 2010, 333 black people lived in the census tract containing the Greenwood Food and Beverage, 548 black people lived in the census track where the shots were fired, and 1,317 black people lived in the census track immediately east of the Greenwood Food and Beverage. Mapping Segregation, THE NEW YORK TIMES (July 8, 2015) https://www.nytimes.com/interactive/2015/07/08/us/census-race-map.html. The suspicion leading to [Defendant's] stop would allow officers to stop any black man in this area who happened to be outdoors wearing dark clothing.

(ECF No. 19, PageID.53.)

particularized suspicion. During the hearing, the government argued that the time of night in which the shots were fired is "certainly going to narrow the number of potential people that can be fitting th[e] description" from dispatch because "there's just going to be less people out and about at this time." The government did not dispute that the neighborhood where the shots were fired has "an African American majority population," but the government argued that "those numbers go down just by common sense and by reality. At almost midnight at night, you're talking about a much narrower universe of people that are going to be out."

"In all cases, whether officers initiate a seizure pursuant to a tip or pursuant to other leads, 'the detaining officers must have a *particularized* and *objective* basis for suspecting the particular person stopped . . . .'" *United States v. Hudson*, 405 F.3d 425, 434 (6th Cir. 2005) (alteration in original) (emphasis in original) (quoting *Cortez*, 449 U.S. at 417–18). This court has stated:

> A reliable description of a suspect may provide a sufficient basis for a *Terry* stop of a person matching that description so long as the description sufficiently "winnow[s] the class of potential suspects." *United States v. Davis*, 341 F. App'x 139, 140–41 (6th Cir. 2009) (quoting *United States v. Powell*, 210

> F.3d 373 (table op.), 2000 WL 357262, at *3 (6th Cir. Mar. 29,
> 2000)). But a *Terry* stop of a person based on a description
> that "could describe any number of people in the neighborhood
> where [the person] was walking" would not be supported by
> reasonable suspicion because it "could not have provided a
> 'particularized and objective basis for suspecting [that]
> particular person.'" *King v. United States*, 917 F.3d 409, 426
> (6th Cir. 2019) (quoting *Dorsey*, 517 F.3d at 395), *cert. granted
> on other grounds*, *Brownback v. King*, No. 19-546, —— U.S. –
> ——, 140 S. Ct. 2563, 206 L.Ed.2d 495 (U.S. Mar. 30, 2020).

*Fleming v. Scruggs*, 465 F. Supp. 3d 720, 732 (E.D. Mich. 2020)

(alterations in original) (footnote omitted).

In *Fleming v. Scruggs*, Judge Matthew F. Leitman concluded that

one of the reasons why officers did not have reasonable suspicion to stop

an individual named Ronnie Fleming was that a "be on the lookout"

(BOLO) text message from the Michigan Department of Corrections to

the police about a parole absconder

> did not sufficiently suggest that Fleming was the absconder.
> The similarities were at a relatively high level of generality—
> both Fleming and the absconder were black men with facial
> hair and a ball cap riding a bike. As Fleming persuasively
> observes, that description could have fit a reasonably large
> number of individuals in Pontiac—a city with a large black
> population and a high poverty rate whose under-resourced
> residents may be unable to afford cars and may rely on
> bicycles to get around. Because the similarities between
> Fleming and the BOLO would appear to be common to "any

> number of people" in Pontiac, they fall short of establishing
> particularized reasonable suspicion. *King*, 917 F.3d at 426.

*Id.* at 737 (footnotes omitted). *See Hudson*, 405 F.3d at 438–39 ("While
the[] facts suggest the police were searching for a narrower class of people
than simply all black men—namely, black men in the company of [a
woman named] Jamie Potts—they are nonetheless descriptive of 'too
many people [] to constitute particular, articulable facts on which to base
reasonable suspicion.'" (internal citations omitted)).

In this case, the government does not contest Defendant's assertion
that in 2010 "over 2,000 black people lived in the half mile radius from
where the shots were fired." (ECF No. 28, PageID.131; *see* ECF No. 19,
PageID.53–54.) Based on this data, and on Knoblauch's testimony that
the shots were fired in an area with a large African American population,
the description of Black males wearing all black and black hoodies could
potentially describe "any number of people in the neighborhood."
*Fleming*, 465 F. Supp. 3d at 732. The government argues that the time of
night "narrow[ed] the number of potential people" who matched
dispatch's description, but the government does not show that the
description was sufficiently particular and "sufficiently 'winnow[ed] the
class of potential suspects.'" *Id.* (quoting *Davis*, 341 F. App'x at 140–41).

59

Indeed, officers did stop, more than once, another Black male who the officers believed matched the description from dispatch. (*See* ECF No. 19-7.) Therefore, the government has not demonstrated that dispatch's description gave Wickham a "particularized and objective basis for suspecting" Defendant of criminal activity, *Fleming*, 465 F. Supp. 3d at 732, which was necessary for Wickham to have reasonable suspicion to stop Defendant.

## B. Time of Night and High Crime Area

The government's third reasonable suspicion factor is that "the time of the incident is in the late evening hours, when less people are usually outside." (ECF No. 25, PageID.107.) Its fourth factor is that the shots were fired in a high crime area.

"[P]resence in a high-crime location and the lateness of the hour . . . 'may not, without more, give rise to reasonable suspicion,' but they may be considered in the totality of the circumstances." *Johnson*, 620 F.3d at 692–93 (quoting *Caruthers*, 458 F.3d at 467); *see United States v. Baldwin*, 114 F. App'x 675, 680 (6th Cir. 2004) (stating that "the fact that a stop occurred in a high crime area is 'among the relevant contextual considerations in a *Terry* analysis,'" but "it is clear that '[a]n individual's

presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime'" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))); *McElrath*, 786 F. App'x at 580 (stating that "presence in a high-crime neighborhood . . . is not alone sufficient to justify a stop" (internal citations omitted)). The Sixth Circuit cautions that these factors "should not be given undue weight" because they are "'context-based factors that would have pertained to anyone in the [area] at th[e] time'" of the event in question. *Johnson*, 620 F.3d at 692–93 (quoting *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009); citing *Caruthers*, 458 F.3d at 467). The Sixth Circuit found "[t]his caveat . . . especially appropriate in [a] case" in which a police officer "testified that the area was known for drug trafficking specifically" but "observed no conduct from [the defendant] consistent with drug activity." *Id.* at 693 (citing *United States v. Paulette*, 457 F.3d 601, 602, 606 (6th Cir. 2006)). And in *United States v. Davis*, this court found that it was not "particularly relevant that it was night" when a stop occurred because the stop took place at a gas station, which is "a very well lit area." No. 11-CR-20703, 2013 WL 71821, at *6 (E.D. Mich. Jan. 7, 2013), *aff'd*, 554 F. App'x 485 (6th Cir. 2014).

The Sixth Circuit notes that "labeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling." *Caruthers*, 458 F.3d at 467. Relying on language from a "sister circuit," the Sixth Circuit states that "[w]e must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business, but is limited to specific, circumscribed locations where particular crimes occur with unusual regularity." *Id.* at 467–68 (quoting *United States v. Montero–Camargo*, 208 F.3d 1122, 1138 (9th Cir.)). In *Caruthers*, the court found that

> these concerns are alleviated here because Caruthers[, the defendant,] concedes that "[t]he area around the intersection of Lewis and Lafayette streets in Nashville is a 'high crime' area where officers expect nightly calls regarding robberies or shots fired." . . . Notably, the "high-crime" area is circumscribed to a specific intersection rather than an entire neighborhood. Furthermore, the crimes that frequently occur in the area are specific and related to the reason for which Caruthers was stopped. Thus, we are satisfied that we have not too easily permitted the consideration of this factor.

*Id.* at 468.

In this case, the shots fired were initially reported to dispatch at 10:55 p.m., and Wickham first spotted Defendant at approximately 11:01

p.m. These events happened at night, but like the stop in *Davis*, the stop in this case occurred in a well-lit area because Defendant was stopped inside Greenwood Food Market. Moreover, the caveat discussed above applies here. Wickham and Knoblauch testified that the shots were fired in a high crime area where shots are commonly fired, but they "observed no conduct from [Defendant] consistent with [this type of] activity." *Johnson*, 620 F.3d at 693. Defendant does not contest the high crime area as defined by the government and Knoblauch, but the high crime area is not circumscribed to a small area. The government indicated that Wickham's testimony related to "the area generally associated with" the maps the parties submitted as exhibits to their filings. (*See* ECF No. 25-4, PageID.126; ECF No. 28-2, PageID.139.) And Knoblauch indicated that the high crime area is a "fairly large" area that consists of the area south of West Wesley Street, north of the City's southern limit, east of West Avenue, and west of Cooper Street. Knoblauch also indicated that this area has a large African American population. These definitions of the high crime area do not "alleviate[]" the "special concerns of racial, ethnic, and socioeconomic profiling" identified by the Sixth Circuit. *Caruthers*, 458 F.3d at 467. For all of these reasons, the factors involving

time of night and high crime area are insufficient, on their own, to support a finding of reasonable suspicion in this case. They also do not support a finding of reasonable suspicion when considered with the other factors identified by the government, as discussed below.

## C. Temporal and Geographic Proximity

The government's fourth and fifth reasonable suspicion factors are that Wickham encountered Defendant in close temporal and geographic proximity to when and where the shots were fired. Wickham spotted Defendant approximately five minutes after dispatch received the first shots fired call. (*See* ECF No. 25-2, PageID.115–116.) And Wickham encountered Defendant 0.3 miles away from the shooting location. (*See* ECF No. 25-4, PageID.126.) These considerations are insufficient, by themselves, to establish reasonable suspicion.

The Sixth Circuit "ha[s] repeatedly held that a person's proximity [in time and location] to the location of a crime is a relevant factor in a *Terry* analysis." *United States v. Thornton*, 621 F. App'x 324, 328 (6th Cir. 2015) (footnote omitted) (citing *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir. 2013); *Johnson*, 246 F. App'x at 987). Yet "general proximity to the site of suspected criminal activity . . . is not alone

sufficient to justify a stop." *McElrath*, 786 F. App'x at 580 (internal citations omitted).

In *United States v. Thornton*, the Sixth Circuit concluded that officers "had reasonable, articulable suspicion to stop and frisk" an individual "based on his geographic and temporal proximity to recently fired gunshots" heard by the officers. 621 F. App'x at 329. But this holding was also based on "the fact that [the individual] was the only person in the area, and his furtive movements in response to noticing the officers' squad car." *Id*. These additional circumstances do not exist here; there were other individuals in the area where Defendant was stopped and Defendant did not make furtive movements. Defendant's temporal and geographic proximity to the location of the shooting, on their own, do not give rise to reasonable suspicion. They also do not give rise to reasonable suspicion when viewed in combination with the other factors identified by the government, as discussed below.

### D. The Other Individual's Statement

The government's seventh reasonable suspicion factor is that "the other individual who was with the defendant in the parking lot and detained outside the store[] admitted to being on the same street as the

home that was targeted." (ECF No. 25, PageID.107.) Knoblauch's body camera footage shows that the individual who exited the store told the officers that he heard the shots fired and said: "I was on Morrell, though. I was on Morr—Williams Street." (ECF No. 19-5, 01:43–02:12.) The individual's statement is also captured in Knoblauch's report. (*See* ECF No. 19-4, PageID.88 ("[T]he subject started to say he had come from Morrell Street then stated that he was on Williams Street when he heard the shots fired.").)

The Sixth Circuit has stated that "[a] person's mere propinquity to others independently suspected of criminal activity . . . is a relevant factor in determining reasonable suspicion." *Keeling*, 783 F. App'x at 523 (citing *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)). In *United States v. Keeling*, the Sixth Circuit considered this factor in noting the defendant's trips to drug houses and that he stayed at each location "for approximately twenty minutes—a period of time that the officers testified was consistent with drug transactions." *Id.* at 522–23. The court concluded that this factor supported a finding that the stop of the defendant was supported by reasonable suspicion, but other factors were considered as well:

On top of th[e defendant's visits to drug houses], the officers observed [the defendant's] car make an erratic, abrupt turn once he had left the second drug house and came across the unmarked patrol car. The officers knew of [the defendant's] criminal history, including a previous attempt to evade police, and had already identified him as a person of interest in the task force's ongoing investigation. Looking at these facts in the aggregate, the officers had "a particularized and objective basis" to believe that [the defendant] was in the process of trafficking in methamphetamine. *See Lyons*, 687 F.3d at 763 (quoting *Dorsey*, 517 F.3d at 395).

*Id.* at 523. The facts in *Keeling*, which were considered "in the aggregate," *id.*, are distinguishable from the facts in this case. Here, Wickham did not observe Defendant make any "erratic, abrupt" movements; Wickham knew nothing about Defendant before stopping him, and therefore, was unfamiliar with his criminal history; and Wickham had not identified Defendant as "a person of interest" in his investigation. *Id.*

In *United States v. Patterson*, the police received an anonymous hotline complaint of illegal drug sales at a certain corner that one of the responding officers knew to be a "hot spot." 340 F.3d 368, 369 (6th Cir. 2003). When the officers arrived at the corner, a group of at least eight Black males was standing "about a house length" away. *Id.* The individuals, including someone named Michael Patterson,

did not alter their behavior until the officers got out of their [unmarked] car dressed in police gear. At that point, the group moved away while tucking their hands in their pockets. The officers observed one of the individuals, not Patterson, making a throwing motion towards the bushes. Seeing this, the officers requested that all of the individuals stop, take their hands out of their pockets, and place them on a nearby vehicle. The officers claim this was to search for weapons and drugs and to ensure the officers' safety.

*Id.* at 369–70. The officer who conducted a pat-down of Patterson found that he had a weapon. *See id.* at 370. Patterson was arrested and charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). *See id.* Patterson filed a motion to suppress that was denied by the district court. *See id.*

Patterson appealed the district court's denial of his motion to suppress, and the Sixth Circuit reversed. The court of appeals concluded that the "hotline tip is of little value as to establishing reasonable suspicion," *id.* at 371, and that "Patterson walking away from the police when they got out of their unmarked car constitutes a factor to be outrightly dismissed" because "Patterson's behavior is innocent and insufficient to provide the police with reasonable suspicion." *Id.* at 372. The court rejected the officers' argument that "their observation at the scene of one of the group throwing an object away contributed to the

68

totality of the circumstances supporting their reasonable suspicion to stop the group." *Id.* The Sixth Circuit explained that

> [t]he Supreme Court has made clear . . . that a warrantless search must be based on individualized suspicion. *Chandler v. Miller*, 520 U.S. 305, 313, 117 S. Ct. 1295, 137 L.Ed.2d 513 (1997). In order to search Patterson, the officers only could factor in Patterson's actions and the circumstances surrounding him alone in order to constitute reasonable suspicion. Because the officers might have seen one member of the group throw something lends little more to the totality of the circumstances surrounding Patterson. *See id.*

*Id.*

In this case, Wickham testified that the other individual's statement about being on Morrell Street was relevant because the shots were fired on Morrell Street.[19] But Wickham knew nothing about

---

[19] Wickham also testified that the individual who exited the market made inconsistent statements. Wickham reached this conclusion based on the individual's statements about being on Morrell Street, on Williams Street, and at the Franklin Homes. As noted above, however, the evidence indicates that Wickham entered the market after the individual mentioned Williams Street but before the individual mentioned the Franklin Homes. (*See* ECF No. 19-4, PageID.88; ECF No. 19-5, 02:00–02:15; ECF No. 19-6, 01:20–01:40.) In addition, Wickham testified that Morrell Street and East Williams Street intersect east of Greenwood Food Market, so the individual could have been on both Morrell Street and Williams Street. Even if the Court were to consider Wickham's testimony that the other individual made inconsistent statements in giving deference to Wickham's training as a law enforcement officer, this portion of Wickham's testimony would not alter the analysis that appears above because Defendant's conduct was innocent and did not give Wickham reasonable suspicion.

Defendant before stopping Defendant and had not seen Defendant engage in any criminal activity. Prior to the stop, Wickham had only observed Defendant walk down West Biddle Street and into Greenwood Food Market, which was "behavior [that] is innocent and insufficient to provide the police with reasonable suspicion." *Id.* The other individual's statement about being on Morrell Street "lends little more to the totality of the circumstances surrounding [Defendant]." *Id.*

### E. Furtive Movement

The government's eighth reasonable suspicion factor is that Defendant and the other individual made "a furtive movement" by entering Greenwood Food Market after they saw Wickham. The government presented this argument for the first time toward the end of the hearing. Counsel based this argument on his recollection of Wickham's testimony that when Defendant and the other individual saw him, they changed the direction in which they were walking and entered the market.

"'Furtive movements made in response to a police presence' are yet another relevant factor that may 'properly contribute to an officer's suspicions.'" *Thornton*, 621 F. App'x at 329 (quoting *Caruthers*, 458 F.3d

at 466). As a result, "the police may validly consider an individual's furtiveness in deciding whether to conduct a *Terry* stop, [but] courts must take care that the factor not be invoked cavalierly." *Caruthers*, 458 F.3d at 466. Furtive movements may include fleeing from the police; bending or leaning "accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon" upon seeing the police, *id.* at 467; a person "quickly" walking to a parked car, opening a car door, tossing an object inside, and "briskly" walking away after spotting police officers, *Thornton*, 621 F. App'x at 328–29; and a police officer observing, before approaching a vehicle, that a person "dip[ped] with his right shoulder toward the floor as if he was placing something under his seat," which is "consistent with an attempt to conceal a firearm." *United States v. Graham*, 483 F.3d 431, 439 (6th Cir. 2007). But

> a person does not create reasonable suspicion by simply walking away from an officer or refusing to respond to an officer's request to converse in the absence of specific allegations of criminal activity . . . . *Johnson*, 620 F.3d at 694 ("[T]here was nothing independently suspicious about [the defendant] *continuing* to walk toward the white car when [the officers] approached." (emphasis added)); *United States v. See*, 574 F.3d 309 (6th Cir. 2009) (holding that two individuals sitting in a car in a parking lot at night was not by itself

sufficient to create reasonable suspicion); *Jacobs v. Village of Ottawa Hills*, 5 Fed. Appx. 390 (6th Cir. 2001).

*United States v. Stittiams*, 417 F. App'x 530, 536 (6th Cir. 2011) (alterations in original); *see Caruthers*, 458 F.3d at 466 (stating that "simply walking away from the police does not give rise to reasonable suspicion" (collecting cases)).

Here, the evidence provided by the government does not demonstrate that Defendant and the other individual made a furtive movement in Wickham's presence. Wickham testified that he saw Defendant and the other individual walk westbound on West Biddle Street—*toward Wickham and in the direction of the shooting*—and that he saw them walk in front of Greenwood Food Market and in the market's parking lot. Defendant and the other individual looked in Wickham's direction, saw Wickham, continued walking, and entered the market. Wickham testified that he did not see them engage in any criminal activity. And contrary to the government's assertion, Wickham did not testify that when Defendant and the other individual saw him, they changed the direction in which they were walking. Even if they had started walking in a different direction upon seeing Wickham, walking away from an officer does not create reasonable suspicion. *See id.* There

72

is also no indication that Defendant and the other individual ran away from Wickham. Wickham testified that the individual who exited the market was not out of breath and that Defendant did not appear to be sweating or out of breath from running when Wickham encountered him inside the store. Thus, the government has not shown that Defendant or the other individual made a furtive movement that "contribute[d] to [Wickham's] suspicions," *Thornton*, 621 F. App'x at 329, and gave Wickham reasonable suspicion to stop Defendant.

## F. Totality of the Circumstances Analysis

Considering all of the factors identified by the government, the Court concludes that the government has not met its burden of showing that Wickham had reasonable suspicion to stop Defendant. With respect to the government's first factor, it was reasonable for Wickham to believe that a crime had taken place on the night of February 22, 2020 based on the information from dispatch. At least two 911 callers whose identities are easily ascertainable reported to dispatch that shots were fired. Postma, Knoblauch, and other officers who heard the gunshots themselves corroborated the shots fired. Defendant does not dispute that shots were fired, and he recognizes that this factor "may have supported

a reasonable suspicion that criminal activity had occurred in the area."
(ECF No. 28, PageID.132.)

Regarding the government's second factor, dispatch's description of
the suspects came from anonymous 911 callers for whom there is no
identifying information. The tips describing the suspects lack a sufficient
level of reliability to establish reasonable suspicion because the
anonymous 911 callers' identities are not easily ascertainable and
because the tips were not independently corroborated aside from finding
that the description matched Defendant's physical appearance, the tips
did not contain predictive information, and the tips did not allege
criminal activity. In addition, because the tips could describe a number
of people in the area, they did not give Wickham a particularized and
objective basis for suspecting Defendant of criminal activity, which is
required for reasonable suspicion. Therefore, the anonymous tips
describing the suspects are given little weight in the totality-of-the-
circumstances analysis.

The other factors identified by the government—time of night, high
crime area, temporal and geographic proximity, the other individual
stating that he was on Morrell Street, and Defendant and the other

individual making a furtive movement—are insufficient to establish reasonable suspicion. The evidence provided by the government does not show that Defendant and the other individual made a furtive movement, and "[t]he[] [remaining] factors alone do not provide an objective and particularized basis for stopping [Defendant]." *Davis*, 2013 WL 71821, at *6. The factors involving time of night, high crime area, and temporal and geographic proximity would have pertained to anyone who was at Greenwood Food Market when Wickham was there after the shots were fired on February 22, 2020. And the statement made by the other individual did not give Wickham an objective and particularized basis for stopping Defendant because Defendant's actions—walking down West Biddle Street and entering Greenwood Food Market—were innocent. Wickham testified that prior to stopping Defendant, Wickham had not been threatened by Defendant, had not seen Defendant engage in any criminal activity, did not see a firearm on Defendant, did not know Defendant was armed, and knew nothing about Defendant. *See United States v. Gross*, 662 F.3d 393, 400 (6th Cir. 2011) (finding it "readily apparent that, under the circumstances, [an officer] did not have a particularized and objective basis for suspecting [the defendant] of

75

criminal activity at the time of the stop" because the officer "admitted at the suppression hearing that 'at the time [he] exited the car, it [was] safe to say that [he was not] aware that there was any crime being committed'"). Accordingly, Wickham did not have reasonable suspicion for the *Terry* stop, and the stop violated Defendant's Fourth Amendment rights.[20]

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS Defendant's motion to suppress evidence. (ECF No. 19.)

IT IS SO ORDERED.

Dated: December 6, 2021        s/Judith E. Levy
Ann Arbor, Michigan            JUDITH E. LEVY
                               United States District Judge

---

[20] In his motion, Defendant does not make substantive arguments about reasonable suspicion for a *Terry* frisk. However, the government argues that "it was entirely reasonable for Deputy Wickham to conduct a pat-down to see if [Defendant] was armed." (ECF No. 25, PageID.111.) "When an officer makes a lawful investigatory stop, he may also perform a precautionary frisk for weapons if he has reasonable suspicion that the person may be armed and dangerous." *United States v. Moberly*, No. 20-5511, 2021 WL 2176880, at *2 (6th Cir. May 27, 2021) (citing *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016)). But "[i]f a stop by a law enforcement agent is found to be improper, any subsequent frisk is also improper." 3A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 682 (4th ed. 2021). Because Wickham's *Terry* stop was improper, the subsequent frisk of Defendant was improper as well.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 6, 2021.

<u>s/William Barkholz</u>
WILLIAM BARKHOLZ
Case Manager

77